```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
JOSE MAURAD,
                    Petitioner,        05 Civ. 0445 (JSR)(DFE)

        - against -
                                       REPORT AND RECOMMENDATION
BRIAN FISCHER, Superintendent of          TO JUDGE RAKOFF
Sing Sing Correctional Facility,
                    Respondent.
-----------------------------------X
```

DOUGLAS F. EATON, United States Magistrate Judge.

Jose Maurad brings this *pro se* habeas corpus petition challenging his conviction for Sodomy in the First Degree (two counts) and Endangering the Welfare of a Child. After a jury trial in Supreme Court, New York County, Justice John Cataldo sentenced Maurad to concurrent determinate prison terms of 23 years on each sodomy count and to a lesser, concurrent term on the endangering count.

### FACTUAL AND PROCEDURAL BACKGROUND

At trial, Maurad was represented by Peter Battala, Esq. from the 18-B panel. On appeal, he was represented by the Cardozo Appeals Clinic (including law student Dominick Schirripa and Adjunct Clinical Law Professor Stanley Neustadter). The Appellate Division unanimously affirmed the conviction. *People v. Maurad*, 308 A.D.2d 419, 764 N.Y.S.2d 823 (1st Dept. 2003), *lv. denied*, 1 N.Y.3d 576, 775 N.Y.S.2d 792 (Ct. App. 2003).

Maurad's short-form petition was filed on January 14, 2005. Respondent concedes that the petition was timely. On July 19, 2005, Assistant Attorney General Nisha M. Desai served and filed a Memorandum of Law in Opposition and her Declaration annexing Exhibits A through E. (I shall refer to certain of those exhibits as "Ex. ___.") Maurad replied with a 2-page traverse dated August 4, 2005. On May 30, 2006, I ordered the unsealing of the state trial transcript for the limited purpose of *in camera* review by me and my staff, and later by Judge Rakoff and his staff. On June 2, 2006, I advised AAG Desai that a few pages were missing from the Cardozo appellate brief and a few pages of trial transcript were illegible. She sent replacement pages to my chambers on June 9 and June 30, 2006.

All parties were in agreement as to the following

contextual facts: On the afternoon of October 29, 1999, E.Q. (a boy then 6 years old) was in an apartment containing four bedrooms. One small bedroom belonged to defendant; a second belonged to defendant's brother and his common-law wife Maria. E.Q. lived elsewhere in the same building; he was spending the day at Maria's apartment because she was his aunt and his parents were at work. Present in the apartment were defendant, E.Q., Maria's baby, Maria's little boy, Maria, and (for some of the time) three visitors: Maria's cousin Blanca and a couple named Miguel and Rosa Bonilla.

The December 2000 trial presented the jury with a stark contest of credibility between the prosecution witnesses and the defense witnesses.

### The Prosecution Case

E.Q.'s testimony (Tr. 158-202): While Maria was sewing in her room, he was taken into defendant's room and anally raped by the defendant, who also played a video of a man and a woman performing a similar sexual act. Defendant told E.Q. that he would kill him if he told his parents what had occurred.

Maria's testimony (Tr. 49-82): Looking for a replacement sewing needle, Maria knocked on Maurad's door. Initially there was no answer. A few moments later, after hearing E.Q. respond, Maria looked through a crack in the door and saw E.Q. nude from the waist down. When E.Q. returned to Maria's room, she asked him what had happened while he was in defendant's room. The boy would not answer; he repeatedly cried when she continued to question him. When E.Q.'s mother returned from work, Maria told her what she had seen. When E.Q.'s mother asked the boy what had happened, E.Q. told her what defendant had done. The women checked E.Q.'s anus and saw that it was injured.

E.Q.'s mother's testimony (Tr. 94-115): She immediately confronted defendant with the allegation of sexual misconduct; he denied it. Later that night, E.Q.'s mother and father brought him to the police station. E.Q. told the police what Maurad had done. He was brought to a hospital.

Dr. Louise Liverpool's testimony (Tr. 203-51): This pediatrician examined E.Q. and saw that his anus was injured in a manner consistent with an act of sodomy. However, she found no other physical evidence. Before applying her own lubricant, she did not check for any trace of the cream that E.Q. alleged had been used by defendant some 12 hours earlier.

2

Detective Williams-Gross's testimony (Tr. 252-312): A few days later, on November 4, 1999, she participated in a search of Maurad's room pursuant to a warrant. She and her colleagues found a small tin of "mentochino" cream, and 19 videotapes, of which at least six depicted scenes of anal intercourse between men and women. In view of Maria's claim that she had seen into this room through a crack in the door, Detective Williams-Gross closed the door, peered through a crack, and was able to see a considerable portion of the room.

The Defense Case

Defendant's testimony (Tr. 371-425): Maurad had a hemorrhoid operation on September 28, 1999, and a hernia operation on October 8, 1999. For the rest of October, the pain was so severe that he was unable to work. (He did not have a steady job, but he had worked occasionally as an electrician.) He generally locked his room, and that is where the apartment's telephone was located. In October, its answering machine recorded some messages from a male caller. On October 25, he mentioned the messages and confronted Maria with his suspicion that she was cheating on her husband (defendant's brother). (At Tr. 71-72, 82, Maria testified that she had not been cheating, and that defendant had made no such allegation prior to his arrest.) On October 29, Maurad spent the morning away from the apartment. Shortly after he returned, Miguel Bonilla, Rosa Bonilla, and Blanca Peleaz arrived at the apartment. At times, while defendant was in his room, E.Q. wandered in, but there was no improper or unusual occurrence of any kind.

The testimony of Rosa Bonilla (Tr. 334-51) and Blanca Peleaz (Tr. 352-63): They visited the apartment, accompanied by Miguel Bonilla. Rosa, Blanca, and Maria worked together in Maria's room, using a sewing machine that belonged to the defendant. The machine's needle broke. To obtain a new needle, Maria went to defendant's room, where E.Q. was playing with Maria's little boy. When Maria returned with a new needle, she did not appear to be upset in any way.

Miguel Bonilla's testimony (Tr. 315-33): As the women sewed in the other room, Miguel spent about 10 minutes in defendant's room, talking with him about job prospects. The children played around the apartment and went in and out of defendant's room periodically. When Maria came in and obtained a replacement needle, Miguel was still in the room. Miguel saw no improper or unusual occurrence of any kind.

3

DISCUSSION

Maurad's habeas petition presses the same four points that were presented to the Appellate Division. Maurad attached no supporting documents; his traverse says that he will continue to rely on the arguments made to the Appellate Division. Grounds One, Two, and Three were presented in Prof. Neustadter's well-written brief. Ground Four was raised solely in Maurad's *pro se* supplemental brief to the Appellate Division, which I have not seen. AAG Desai says she has no copy. (Resp. Mem., p. 5 n.2.) By Memorandum and Order dated June 2, 2006, I requested a copy from Maurad, but he has not responded. I find that it is unnecessary to wait any longer for a response. I will start the discussion with Ground Four.

Ground Four

The People's brief to the Appellate Division (Ex. B, p. 22) states that the *pro se* supplemental brief (a) asserted that the evidence failed to prove guilt beyond a reasonable doubt, and (b) appealed to the Appellate Division's special discretionary jurisdiction to order a new trial if it finds the conviction to be against the weight of the evidence.

Rejecting both arguments, the Appellate Division wrote:

> The verdict was based on legally sufficient evidence and was not against the weight of evidence. There is no basis for disturbing the jury's determinations concerning credibility.

764 N.Y.S.2d at 823.

Any argument about the "weight" of the evidence is merely an issue of state law, codified in New York Criminal Procedure Law §470.15[5]. *See Walton v. Ricks*, 2003 WL 1873607, at **6-7 (S.D.N.Y. Jan. 31, 2003) (McKenna, J.). Federal constitutional law has not recognized any equivalent to a New York claim about "weight" of the evidence. *See id.* at *7; *see also Santos v. Allard*, 2005 WL 783386, at *3 (S.D.N.Y. Apr. 8, 2005) (Gorenstein, M.J.); *Howie v. Phillips*, 2004 WL 2073276, *3 (S.D.N.Y. Sept. 17, 2004) (Sweet, J.).

Federal constitutional law does recognize a claim attacking the sufficiency of evidence, but such a claim must overcome a very heavy burden. In *Jackson v. Virginia*, the Supreme Court said that a federal habeas court must "view[] the evidence in the light most favorable to the prosecution," and then decide whether

"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319, 97 S.Ct. 2781, 2789 (emphasis in original).

Maurad's jury hear E.Q. testify:

> He tied my mouth. He covered my mouth and I wanted to yell but I couldn't because he was covering me. Then he pulled down my pants, and then he put his pee-pee in my butt, and then he gave me that pill, and then with a bullet he said to me if you say that to your mother or to your father I'm going to kill you.

(Tr. 166.)

Generally, the testimony of a single witness is sufficient to support a conviction. *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004). In the case at bar, there was more. Important parts of E.Q.'s testimony were corroborated by four other witnesses. His aunt testified that she looked through the crack in the closed door and saw E.Q. naked from the waist down. Moreover, E.Q. told the police that defendant played a video showing a man having anal intercourse with a woman; six days later, the police seized 19 videotapes in defendant's room, and six of them showed exactly what E.Q. had described.

To be sure, defendant and his three witnesses presented an innocent scenario. However, a jury's "assessments of the weight of the evidence or the credibility of witnesses are for the jury and [are] not grounds for reversal on appeal." *See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). The jury could rationally believe the prosecution witnesses. In sum, Ground Four has no merit.

<u>Ground One</u>

Ground One is based on Mr. Neustadter's first point to the Appellate Division, which argued:

> MAURAD'S RIGHT TO A FAIR TRIAL WAS PREJUDICED WHEN [THE] PROSECUTOR EXCEEDED THE BOUNDARIES OF LEGITIMATE ADVOCACY DURING SUMMATION.

(Ex. A, p. 12.) Mr. Neustadter claimed that the prosecutor's summation shifted the burden of proof, impugned the defense witnesses, mischaracterized the evidence and the defense's arguments, argued facts that were not in evidence, and bolstered the credibility of the prosecution witnesses. (Ex. A, pp. 12-

13.)

Only one of those claims was made by Maurad's trial attorney, who was in the best position to decide whether a comment sounded so unfair or prejudicial that a curative instruction might be needed. During her summation, the prosecutor stated:

> Let's talk about the witnesses. People's witnesses and defense witnesses. Four witnesses for the Defense, five for the People. You saw them. They sat there. Who looked shifty? Miguel Bonilla sitting in that chair. I submit to you that of all the people that testified, the one who was most reserved, the least willing to make eye contact, the least willing to answer questions, with some exceptions of the defendant was Miguel Bonilla.
> He sat in this chair. You saw him. You watched the demeanor. Compare the answers that you got from the mother, from Maria, from the child, from the detective, from the doctor to all of the answers that you got from the others and remember, for the Spanish speaking witnesses, an interpreter was used[.] [W]ho had difficulty answering the questions with the interpreter, the Defense witnesses or the People[]'s witnesses? I submit to you it was the Defense witnesses who had to have the questions read back to them several times.

(Tr. 459-60.)

Mr. Neustadter explained that the defense witnesses needed extra time to respond because they spoke little English and testified through the assistance of an interpreter. Relying on New York state case law, he argued that the prosecutor exceeded the bounds of fair comment by improperly capitalizing on their language deficiency to "impugn their character and call them liars." (Ex. A, p. 17.)

The Appellate Division ruled: "The prosecutor's comment on the demeanor and credibility of a defense witness was within the bounds of permissible advocacy." *Maurad*, 764 N.Y.S.2d at 823-24. This ruling was not contrary to, or an unreasonable application of, federal law.

The Second Circuit has stated: "A prosecutor is free to comment upon the evidence, including demeanor." *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981); *quoted in United*

6

*States v. Rivera*, 971 F.2d 876, 885 (2d Cir. 1992).

The Appellate Division also said: "All of the defendant's other challenges to the People's summation are unpreserved and we decline to review them in the interest of justice." *Maurad*, 764 N.Y.S.2d at 823-24. The Appellate Division's application of this New York state procedural bar serves as an adequate and independent state law ground for upholding the convictions. As a general matter, this bar prevents our Court from considering belated arguments. *Harris v. Reed*, 489 U.S. 255, 264, 109 S.Ct. 1038, 1044 (1989); *Velazquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).

The Appellate Division then added one sentence:

> ... Were we to review these claims, we would find that the challenged remarks constituted fair comment on the evidence, and reasonable inferences to be drawn therefrom, in response to defense arguments, and that the summation did not deprive defendant of a fair trial.

764 N.Y.S.2d. at 824. This sentence does not lift the procedural bar. *Harris,* 489 U.S. at 264 n.10, 109 S.Ct. at 1044 n.10. In order to overcome the procedural bar, Maurad would have to show either (a) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (b) "a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2565 (1991). Neither exception applies here. Maurad has raised no arguments to show cause for the lack of objection. Nor has he established a fundamental miscarriage of justice, which would require him to demonstrate that he is "actually innocent." *Apricio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001); *Cummings v. Artuz*, 237 F. Supp. 2d 475, 485 (S.D.N.Y. 2002). In sum, Ground One has no merit.

Ground Two

Ground Two is based on Mr. Neustadter's second point to the Appellate Division, which said:

> MAURAD'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY THE PROSECUTOR'S USE OF A PROHIBITED LINE OF CROSS-EXAMINATION OF DEFENSE WITNESSES.

(Ex. A, p. 29.)

After Miguel Bonilla provided exculpatory testimony, the

7

prosecutor cross-examined as follows:

> Q. Did you tell the police what you knew?
>
> A. No, at home. No, no at home they told me.
>
> Q. Did you go to the District Attorney's office and tell them what you knew?
>
> A. No, never.

(Tr. 333). The defense did not object.

When Rosa Bonilla testified, the prosecutor cross-examined as follows:

> Q. And when this happened, you did not go to the police, correct?
>
> A. No.
>
> Q. You didn't contact the District Attorney's office. Is that correct?
>
> A. No.

(Tr. 350-51). Again, the defense did not object. The topic was addressed briefly on summation. The prosecutor stated:

> How likely is it that [Miguel Bonilla] was there for that ten minutes in time that he would need to clear the defendant of this crime and happens to remember that a year later and never mentioned [it] to the police or [t]o the DA's office or anybody else[?]

(Tr. 465-66.)

On appeal, Mr. Neustadter, relying exclusively on state law, cited New York decisions that have required a prosecutor to lay a proper foundation before questioning a witness regarding a failure to report exculpatory information. The prosecutor should first demonstrate that the witness: (1) was aware of the nature of the charges, (2) had reason to recognize that he possessed exculpatory information, (3) had a reasonable motive for acting to exonerate the defendant, and (4) was familiar with the means of bringing such information available to the authorities. *People v. Dawson*, 50 N.Y.2d 311, 428 N.Y.S.2d 914 (Ct. App. 1980). This foundation is not difficult to establish. The

8

prosecutor might well have established it if the defense had raised the issue at trial and demanded a complete foundation.

The Appellate Division ruled:

> Defendant's remaining contentions are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them.

764 N.Y.S.2d at 824.

As explained under Ground One, the Appellate Division based its denial on "adequate and independent state grounds," *Harris*, 489 U.S. at 262, and therefore our court cannot reach this issue on federal habeas review. Moreover, Ground Two was based entirely on state law. In sum, Ground Two has no merit.

<u>Ground Three</u>

Ground Three is based on Mr. Neustadter's third point to the Appellate Division, which said:

> MAURAD WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL BY THE STATE'S USE OF NINETEEN "PORNOGRAPHIC" TAPES FOUND IN HIS ROOM AS EVIDENCE OF BAD CHARACTER AND UNCHARGED - AND UNRELATED - CRIMES.

(Ex. A, p. 34.) Pursuant to a search warrant, the detectives seized 19 videotapes from Maurad's room. Detective Williams-Gross testified that she viewed at least nine of the tapes. (For obvious reasons, no one suggests that the boy should have been asked to view the tapes, for example to see if he recalled the exact one he viewed on the date in question.) She remembered that one was an innocuous family video, six portrayed a man having anal sex with a woman, and two portrayed a man having rear-entry vaginal sex. All 19 videotapes were received in evidence without objection; however, the jury did not watch any of the videotapes.

Only three of the videotapes had a cover describing the contents. When Maurad was on cross-examination, the prosecutor asked Maurad: "Are any of the covers for these in your house?" (Tr. 422.) Maurad volunteered an elaborate answer: "In apartments where I went to fix stuff[,] sometimes[] they would leave [videotapes] and I would take [them]." (Tr. 423.) The prosecutor then asked: "And what does that have to do with covers on the videotapes?" (*Id.*) Maurad replied that videotapes

without covers were often left in vacant apartments; when he "went there to do repairs," he would "find them like that and ... take them sometimes." (*Id.*)

This unlikely testimony was used by the prosecutor in reply to the defense summation, which argued:

> ... I submit to you, ladies and gentlemen, that the hernia operation and the hemorrhoid do not make the alleged act impossible but highly improbable.
> When a person is walking around with pains in his ass, pains in the side[,] they don't think about sex.

(Tr. 442.) Defense counsel probably meant to say "they don't think about performing any sexual act." But trials often have a statement that is less than precise, and that opens up what might be called a "debater's point."

The prosecutor responded that 18 (or at least eight) of the videotapes not only corroborated E.Q.'s statement to the police, but also gave evidence that Maurad was "interested in sex." She ridiculed Maurad's testimony that he had acquired these tapes after they had been discarded by various people. She rhetorically suggested that he had actually acquired them by paying money for them: "Does anyone really think he was only ta[]king from vacant apartments? Is that really where he is getting his foreign collection from?" (Tr. 456-57.) Defense counsel objected to this rhetorical question; the objection was overruled. The prosecutor then continued:

> He has a little tiny room. He's got a bed that takes up most of the room. He has devoted a section of his living space to the collection of these eighteen pornographic movies.
> What does this mean? It means that he is interested in sex. He is thinking about it. He possesses it. It's not a topic that is foreign to him. It's not like he doesn't care. He does care. He is interested in sex and that is relevant because, if the defendant was asexual, it would be a better argument to say, I don't believe in sex.

(Tr. 457.) Defense counsel made no objection to this portion of the summation.

On appeal, Mr. Neustadter argued that "the prosecutor used [the videotapes] as the basis to accuse Maurad of uncharged crimes, specifically theft of videotapes from other apartments."

10

(Ex. A, p. 37.)  In actuality, the prosecutor was not suggesting theft; she was suggesting that Maurad paid good money for these videos, and hence his acquisition of the anal-sex videos was deliberate (and not accidental as suggested by his testimony).

Mr. Neustadter also argued: "[I]ntroduction of a single videotape ... might have probative value. ... However, ... to tell the jury that all of the tapes were pornographic ... highlights the strategy of using them to inflame the prejudices of the jury."  (Ex. A, pp. 35-36.)  On the contrary, if the jury had been told that only one of the 19 tapes was pornographic, then the jury would have been deprived of the truth that at least 8 were pornographic, which was a more powerful corroboration of a crucial detail in E.Q.'s testimony.

As I noted under Ground One, the Appellate Division ruled:

> ... All of defendant's other challenges to the People's summation are unpreserved and we decline to review them in the interest of justice.  Were we to review these claims, we would find that the challenged remarks constituted fair comment on the evidence, and reasonable inferences to be drawn therefrom, in response to defense arguments, and the summation did not deprive defendant of a fair trial.

In sum, Ground Three has no merit.

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, I recommend that Judge Rakoff deny Maurad's habeas petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, (i.e. no later than **August 14, 2006**) by filing written objections with the Pro Se Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Jed S. Rakoff, U.S.D.J. at Room 1340, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street.  Failure to file objections within 10 business days will preclude appellate review.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).  Any request for an extension of time must be addressed to the District Judge.

```
                            [signature]
                            _____
                            DOUGLAS F. EATON
                            U.S. Magistrate Judge
```

Dated:      New York, New York
            July 31, 2006

Copies of this Report and Recommendation were mailed to:

Jose Maurad, #01-A-1052
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Nisha M. Desai, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271

Hon. Jed S. Rakoff